J-A27038-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| L.E.S. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| W.C.D. | : | |
| | : | |
| Appellant | : | No. 1917 EDA 2018 |

Appeal from the Order Entered June 7, 2018
In the Court of Common Pleas of Lehigh County Civil Division at No(s):
2014-FC-1127

BEFORE:  BOWES, J., STABILE, J., and McLAUGHLIN, J.

MEMORANDUM BY McLAUGHLIN, J.:                    **FILED JANUARY 14, 2019**

W.C.D. ("Father") appeals from the order modifying custody and awarding L.E.S. ("Mother") primary custody during the school year of J.C.D. ("Child"), born September 2013. Father argues that the record does not support the trial court's factual findings and that the trial court abused its discretion in applying the custody factors. 23 Pa.C.S.A. § 5328. We affirm.

On August 27, 2014, L.E.S. filed a Complaint for Primary Physical Custody. In October 2018, the trial court entered a final custody order awarding Mother primary custody and Father partial custody. On January 27, 2016, Father filed Petition for Special or Emergency Relief and a Petition for Modification because Mother faced criminal charges for driving under the influence of alcohol ("DUI") and recklessly endangering Child when she left Child unsupervised. Child was in Father's custody pursuant to a temporary protection from abuse order. In February 2016, the trial court entered a final

order awarding Father primary custody and awarding Mother supervised partial custody.

In June 2016, Mother filed an Emergency Petition to Modify Existing Custody Order.[1] On July 27, 2016, the court entered a final order granting Father primary custody and granting Mother supervised partial custody until the week of August 22, 2016, after which Mother would have unsupervised partial custody.

On December 27, 2017, Mother filed a Petition for Modification of the Custody Order. The trial court held a hearing on May 23, 2018.

Mother testified that she lives with her fiancé, with whom she has been in a relationship for almost two years, and that she works at the Brick Tavern in Quakertown. N.T., 5/23/18, at 8, 14. Mother has been diagnosed with bipolar disorder, for which she sees a psychiatrist once every two months and a psychologist once every two weeks. *Id.* at 12. She has been prescribed lithium, and has not had any issues due to this diagnosis in the past two and a half years. *Id.*

Mother testified that she was arrested in January 2016 for DUI after abusing her prescription medications, and, at the time of this DUI, she had left Child at home unsupervised. *Id.* at 13, 69. She pled guilty to DUI and reckless endangerment. *Id.* at 13, 72-73. Mother entered rehab shortly after her arrest, *id.* at 76, was subject to random screenings, has been drug and

_____

[1] Mother also filed a Petition for Contempt, which she later withdrew.

- 2 -

alcohol free since the DUI, and has successfully completed supervision. *Id.* at 13-14. Mother also has a prior conviction for credit card fraud. *Id.* at 69, 72.

Mother testified that M.R. ("Maternal Grandmother"), as well as Mother's brother and grandparents live near her. *Id.* at 14. Her mother provides childcare and her brother and his girlfriend occasionally help. *Id.* at 15. Mother's grandparents and her aunt and uncle have also offered to assist with childcare. *Id.* at 16.

Mother resides in the East Penn School District, has investigated the elementary school, and has researched sports and other activities for Child. *Id.* at 18-19. She discussed how she spends her time with Child, including playing in the house with puzzles and games, walking to the park, and going to the library. *Id.* at 21. She also testified regarding Child's eating habits, bath time routine, and bedtime routine. *Id.* at 23-24.

Mother testified that Child told her that Father took him to the dentist, but that the insurance company called her and informed her that Child was overdue for a physical. *Id.* at 25. Mother has not spoken with Father about Child's medical appointments. *Id.* at 66. Mother also testified that when Father drops off Child, Child's fingernails are dirty, his hair is oily, and he does not smell clean. *Id.* at 26.

Mother testified regarding Father's communication with her. She stated that when Child is with her, and he asked to call or text Father, Mother did so. *Id.* at 41. Father does not contact Mother when Child is in Father's custody, and Father does not answer the phone when Mother calls. *Id.* at 41-42. Mother

further testified that there was a fire at Father's home that she did not learn about until approximately three days after Father and Child had been displaced. *Id.* at 36. She learned about the fire from Facebook, and, when Mother called, Father provided limited details about the fire and about the fire's effect on Child. *Id.* at 37-39. Mother also testified that Father requested a FaceTime conversation in November 2017 to discuss some behavioral problems Child was having. *Id.* at 51. Mother provided the dates and time of her availability. *Id.* Father said he would speak with his girlfriend, but never responded with his availability. *Id.* Mother did not follow up after she did not hear from Father. *Id.* at 52.

Father and Mother live two hours away from each other, but Father works ten minutes from Mother's home. *Id.* at 45. When Child is to return to Father on a Saturday, Father picks him up from Mother's home. Although Father does work some Sundays, he only allowed Mother to drop Child at his work on one Sunday. *Id.* at 42-43. Father has insisted that Mother drive Child to Carlisle, reasoning that Child has a playdate or must be back by Child's bedtime. *Id.* at 43.

Father also testified at the hearing. He said he never received phone calls from Mother, other than following a car accident that Mother and Child were in, and never declined her phone calls. *Id.* at 89. Father has accommodated changes in the schedule when Mother has requested them, and, when he is in Allentown on Sundays, he usually stays too late to take Child home with him. *Id.* at 90.

- 4 -

Father discussed the fire at his home, which resulted in smoke damage throughout the house and a hole in the living room floor. *Id.* at 103. Most of Child's toys were on the second floor, and were not damaged. *Id.* Father said that Mother called him the day after the fire, not three days later. *Id.* at 106. He told her Child was fine and that he did not know the extent of the damage. *Id.* He did not call her on the day it happened because he needed to find somewhere to stay. *Id.* He intended to call her, but it was "not at the top of [his] list." *Id.* at 107. If he had to do it again, he would call her on the first day. *Id.*

Father did not have documentation that Mother requested changes to the order, that he accommodated requested changes to the custody schedule, or that he followed-up with Mother after the fire. *Id.* at 136-38, 141, 145. Father testified that the FaceTime meeting he attempted to arrange did not occur because Mother insisted it happen in person, which was difficult to arrange. *Id.* at 131.

Father stated that he withheld Child from Mother on one occasion, December 30, 2016. *Id.* at 87. Mother was supposed to have a urine screen on December 26, 2016, but had not done so. *Id.* Father informed Mother he would not drop off Child until she provided a clean urine screen. *Id.* On December 29, 2016, Mother replied that the office was closed. *Id.* Mother filed a petition for contempt when Father failed to bring Child on December 30, 2016. *Id.* at 88. The petition was dismissed, with Father providing Mother a make-up custody day. *Id.*

Father described the duties he takes regarding Child, including feeding him, getting him to and from school, participating in various activities, and taking him to doctor's appointments. *Id.* at 91. He also discussed Child's current school. *Id.* at 92-93. Father took steps to address Child's behavioral problems, and attended school conferences and the school Christmas party. *Id.* at 94, 96. He testified that Mother had been invited to the events, but had not attended. *Id.* at 97. Father did not present any documentation that he informed Mother of the school events. *Id.* at

Father stated he had concerns about Mother's history of drug use, *id.* at 109, but had no evidence that Mother abused prescription drugs or alcohol since her arrest. *Id.* at 142.

Father owns Allentown Tire, which is located in Allentown, and The Falling Tree, a craft store based out of Carlisle, which does mostly online sales. *Id.* at 114. He worked for Allentown Tire prior to purchasing it in March 2018. When asked why he lived two hours from Allentown Tire, he stated that he did not "need to be in Allentown for the shop to run." *Id.* at 143. Father's girlfriend A.R. also works at Allentown Tire and Falling Tree. *Id.* at 192.

Father has a two-year-old daughter, whom he does not see and whom Child does not know. *Id.* at 125. Father has two sisters, who live near Wilkes-Barre. *Id.* at 98. Child sees his aunts, cousins, and paternal grandparents once or twice a month. *Id.* 98.

Mother's fiancé, R.Z., testified about his interactions with Child. He further stated that over the past two years Mother has become "much more stable as a person." *Id.* at 161.

Maternal Grandmother also testified. She stated that if Mother and R.Z. are working during Mother's custody time, she cares for Child. *Id.* at 173. She would be available to provide care if Mother received additional custody time. *Id.* at 173-74.

E.K., Mother's friend, testified that she and Mother had been friends since they were five. She has seen positive changes in Mother in the past two years, including that Mother goes out less, has more work ethic, and she is "doing things for [Child] primarily." *Id.* at 187.

The trial court addressed the Section 5328 custody factors and concluded that it would be in Child's best interest to award primary custody to Mother during the school year, with Father having custody on alternate weekends, and for the parties to share physical custody during the summer. In addition to the Section 5328 factors, the court also considered the party's financial ability and "morality and character." Father filed a timely notice of appeal.

Father raises the following issues on appeal:

> I. Did the Trial Court err in finding the factor of which party is more likely to encourage and permit frequent and continuing contact between the Child and the other party to favor Mother?

II. Did the Trial Court err in finding the factor of parental duties performed by each party on behalf of the Child to be even between Mother and Father?

III. Did the Trial Court err in finding the factor of need for stability and continuity in the Child's education, family life and community to be even between the parties when Father has had the Child for the past 22 months and there is nothing on the record to support a change should occur?

IV. Did the Trial Court err in finding the factor of which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the Child adequate for the Child's emotional needs to be even between Mother and Father[?]

V. Did the Trial Court err in finding the factor of which party is more likely to attend the daily physical, emotional, developmental, educations and special needs of the Child to be even between Mother and Father despite the fact the record supports the [sic]?

VI. Did the Trial Court err in finding the factor of the party's availability to care for the Child or ability to make appropriate child-care [arrangements] favors Mother despite the fact the record does not support the inferences made by the Trial Court in order to reach its conclusion?

VII. Did the Trial Court err in finding the factor of which party has the ability to provide financially for the Child to be even between the parties despite the record showing that Mother does not have the ability to provide financially for the Child?

VIII. Did the Trial Court err in finding the factor of morality and character to be even between the parties?

IX. Did the Trial Court err in the inferences and conclusions it drew about Father's priority in contacting Mother about Father's house fire on December 20, 2017?

X. That in rendering its decision in this case, did the Trial Court err in [several] of its inferences and opinions about Father that are unsupported by the record and totality of the evidence?

XI. Did the Trial Court err in finding that the best interest of child is served by awarding Mother primary custody during the school year with alternate weekends to Father?

Father's Br. at 5-7.

"In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion." *V.B. v. J.E.B.*, 55 A.3d 1193, 1197 (Pa.Super. 2012) (quoting *C.R.F. v. S.E.F.*, 45 A.3d 441, 443 (Pa.Super. 2012)). This Court "must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations." *Id.* (quoting *C.R.F.*, 45 A.3d at 443). We defer to the credibility determinations of the presiding trial judge, "who viewed and assessed the witnesses first-hand." *Id.* (quoting *C.R.F.*, 45 A.3d at 443). We, however, "are not bound by the trial court's deductions or inferences from its factual findings[,]" and "[u]ltimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record." *Id.* (quoting *C.R.F.*, 45 A.3d at 443). We may reject the trial court's conclusions "only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court." *Id.* (quoting *C.R.F.*, 45 A.3d at 443).

"When a trial court orders a form of custody, the best interest of the child is paramount." *S.W.D. v. S.A.R.*, 96 A.3d 396, 400 (Pa.Super. 2014) (citing *J.R.M. v. J.E.A.*, 33 A.3d 647, 650 (Pa.Super. 2011)). A non-exclusive list of factors a court should consider when awarding custody are set forth at 23 Pa.C.S.A. § 5328(a):

(a) Factors.—In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a).

Father first claims the trial court erred in finding Mother was more likely to encourage and permit frequent and continuing contact between Child and the other party. He claims the court erred in weighing against Father his withholding of Child on December 30, 2016. He also stresses that he testified that he did not withhold phone calls and that he accommodated Mother when she requested changes to the custody schedule.

The trial court addressed which party is more likely to engage and permit frequent and continuing contact between Child and the other party as follows:

> Mother states that she has called Father when the Child is with her, and let the Child talk with Father. She also states that Father often says that the Child must be back in Carlisle for playdates, bedtime, etc. cutting her time short. She also states that Father has declined calls from Mother. Father said that he withheld the Child on December 30, 2016, that Mother was to take a urine screen and did not, that he told her that she needed a clean screen, but that she did not get the test completed, but instead filed for contempt. We find

- 11 -

that this factor is even with a very slight tip to Mother's favor.

Final Custody Order, filed June 7, 2018, at Attachment at 1 ("Court Findings").

The trial court credited Mother's testimony, including her testimony that that she permits Child to call Father during her custody time and that Child does not call her during Father's custody time. It is not clear that the court held the fact that Father withheld Child because he believed Mother missed a urine screen against Father. Further, even if it did, this would not have been improper. The record supports these findings, and the court did not abuse its discretion.

In his second issue, Father claims the court erred in finding that the parental duties factor was even between Mother and Father. He claims the court's reasoning—that Mother had primary custody of Child for 18 months before Father had primary custody for 22 months—was contrary to the requirement that the court must make decisions based on current circumstances.

The trial court concluded:

> The evidence shows that Mother and Father resided together until August 2014. No testimony was provided as to who was primary caregiver during that period so, for that period we will conclude that this is even. Thereafter, from August of 2014 until February of 2016, the Child resided primarily with Mother; thus, she was the primary caregiver during that period. Then, from February of 2016 to the present, the Child has resided with Father; so he has been the primary caregiver during that period. So, Mother has been the primary caregiver for a little over eighteen months and Father has been the primary caregiver for

approximately twenty-two months. Thus, this factor is substantially even.

Court Findings at 1.

The record supports the court's finding that the factor is even. Although Mother has not been Child's primary care giver for the past 22 months, as the trial court noted, she was Child's primary caregiver for a substantial time prior to that. Further, the testimony supported that both Mother and Father are able to, and do, perform parental duties for Child while Child is in his or her care. The court did not abuse its discretion in addressing this factor.

Father next claims the trial court erred in finding the factor that considers the need for stability and continuity in Child's education, family, and community to be even. He claims Child has been in Father's primary care and attends a preschool near Father and, therefore, custody with Father would provide stability.

Regarding the need for stability and continuity in Child's education, family life, and community life, the trial court found:

> The Child is currently in preschool. At Mother's home, the Child would attend Lincoln Elementary School, which is full day kindergarten, three classes per week with twenty children, all female teachers with a bus stop right outside Mother's house. Mother has checked into all kinds of activities, sports, Cub Scouts, etc., and [all are] available. She indicates that she takes the Child places, takes walks, reads, takes him to the library and does lots of other activities.
>
> Father indicates that the Child attends Miracle Bush School in preschool and needs to be in that full-time for one year before proceeding to kindergarten, but that this is not being allowed because of the parties' custody schedule. At the Child's young age, the education aspect is not a big factor,

- 13 -

he has simply not started school anywhere yet. He would appear to be stable at both houses; the only reason that Father is providing continuity is because that is where he has been for the last year and a half or so. The big stability question is as to Mother because of her past behavior and leaving the Child alone when he was two years old to go out and drink and get a DUI conviction. However, she has been good ever since. She had a conviction for a credit card fraud matter which is a crime involving *crimen falsi*. Thus, I would be entitled to find all of her testimony not credible on that basis alone. However, based upon observing her and listening to her, watching her demeanor and taking the totality of the evidence into account, I do find her credible and that conviction is not enough to disturb that finding of credibility. As to the DUI, there is no question that that put the Child at risk. However, querie: does that incident mean that Mother can never have primary custody of the Child ever again? Was that the first domino that knocks all of the other dominos over for the rest of the Child's life and her life? It appears that she has rehabilitated herself; there is no evidence that she had any additional criminal problems since then and has demonstrated good stability since then. She is currently in a relationship, she has a productive job making good money, she has the support of her mother, who lives nearby. Therefore, we find this factor is even.

Court Findings at 2-3.

The trial court noted where Child would attend school for each household, but also noted the young age of Child when considering this factor. The trial court further noted that both Father and Mother are able to provide continuity and care for Child, but that Child has been in Father's primary care for 22 months. The court found that "the big stability question was mom," as she had previously left Child alone. The court found that Mother had rehabilitated herself and had demonstrated good stability, as she is in a relationship, has a productive job, and has the support of her mother. The

court found that based on the current circumstances, the factor was even. This was not an abuse of discretion.

Father next argues the court erred in finding that the party more likely to maintain a loving, stable, consistent, and nurturing relationship with Child was even, noting Mother would "not have lost primary custody of the Child" if she was able to provide a stable and consistent relationship and that she left Child alone when he was two years old. Father argues Child has a stable life with him.

The trial court found:

> We find that this is even. Both parties testified in a fair degree of detail about their relationship with the Child and it appears that both have a good relationship with the Child.

Court Findings at 4. The record, including Mother's and Father's testimony, support this, as both testified regarding their interactions with Child. The trial court did not abuse its discretion in finding this factor to be even.

Father next argues that the trial court erred in finding that the factor that considers which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of Child to be even. Father argued this factor should have weighed in his favor, as Mother only attended to Child's daily needs on the weekends and Maternal Grandmother provides many of the daily needs during Mother's custody time. Further, Mother had a mental health diagnosis, her waitressing schedule made her unavailable to care for Child, and Mother was not even able to fully exercise her custody time due to her work schedule.

The trial court found this factor to be even, reasoning:

> Mother describes that the Child gets a bath daily and that she does a variety of things with him. Father says he attends all school conferences and activities and that Mother attended none of these, he said that Mother has drug and alcohol issues, but provided nothing beyond what we have already discussed. He said she has mental health issues, but did not provide any sufficient evidence on this.

Court Findings at 4.

The record supports these findings. Although Mother testified that she had a mental health diagnosis, she also testified she received therapy and took prescription medication, and that she has not had issues with drugs or alcohol since her arrest. Moreover, Mother's testimony supports a conclusion that she provides for Child's daily needs when Child is in her care. The trial court did not abuse its discretion when addressing this factor.

Father argues the court erred in finding the factor regarding the party's availability to care for Child or make appropriate child-care arrangements favored Mother. He notes that Mother's work schedule makes her often unavailable to care for Child during the evenings and that the court put too much weight on Maternal Grandmother's ability to provide childcare.

The trial court found this factor favored Mother, reasoning

> [M.R.], maternal grandmother, does, in fact, provide child-care and is ready, willing and continues to do that. Mother indicates that her brother, grandparents, aunt and uncle also occasionally do this and are available to do this. Father provided no evidence of child-care arrangements for when he is not available. There may be arguably an assumption that his girlfriend would do so, but that was not stated nor was it indicated who would care for the Child if she was not

> available since she works the same place Father does. So, this factor favors Mother. It is also noteworthy that Father's job is in Allentown and his other job is done from home so, quer[y]: what would happen if Father is at work in Allentown and his girlfriend is at work in Allentown and an issue comes up in Carlisle while the Child is in the school? How would Father handle that?

Court Findings at 4-5.

The record supports these findings, and the trial court did not abuse its discretion in finding this factor favored Mother. Mother testified that Maternal Grandmother and other relatives of Mother could provide childcare when needed, and Maternal Grandmother's testimony corroborated that she provides care. Father provided no evidence regarding childcare arrangements when he was not available, even though he and his girlfriend sometimes work two hours from Child's school.

Father next argues that the trial court erred in finding that both parties have the ability to provide financially for Child.

Although Section 5328(a)(16) permits trial courts to consider other relevant factors, the court is not permitted to consider as a custody factor which party is more likely to have the ability to provide financially for Child. Rather, "[i]n a custody proceeding, the sole permissible inquiry into the relative wealth of the parties is whether either party is unable to provide adequately for the child." **Roadcap v. Roadcap**, 778 A.2d 687, 690 (Pa.Super. 2001) (quoting **Brooks v. Brooks**, 319 Pa.Super. 268, 466 A.2d 152, 156 (1983)) (alteration in original). Therefore, "unless the income of one

party is so inadequate as to preclude raising the children in a decent manner, the matter of relative income is irrelevant." ***Id.***

Here, there was no suggestion Mother's or Father's income was so inadequate as to preclude raising Child in decent manner, and therefore, their financial ability is irrelevant to the custody determination. Although the trial court should not have considered this factor, remand is not necessary because the court found the factor to be even between the parties and Father sustained no prejudice.

Father next claims the court erred in finding the "morality and character" factor to be even. The parties' "morality and character" is not an enumerated factor. The trial court purported to review this factor under "any other relevant factors." Without any evidence that a parties' "morality or character" had a detrimental effect on a child, such a factor is irrelevant to the custody determination. ***See V.B.***, 55 A.3d at 1198, 1201-02 (noting trial court "injected artificial morality concerns that the legislature has deemed irrelevant" and finding Father's prior participation in polyamory could not be weighed against him unless evidence establish his participation had adverse impact on child). It is not clear what evidence the court considered in this "morality and character" factor, and there was no evidence that either party's "morality or character" had a detrimental impact on Child. Father argues that this factor should weigh in his favor because Mother has been convicted of DUI and of recklessly endangering Child. However, the court properly considered Mother's criminal history and prior behavior when addressing other

statutory factors. Therefore, this additional "morality and character" factor was irrelevant. However, we need not remand because the trial court found the factor to be even.

Father next argues the trial court erred in drawing inferences and conclusions that Father did not prioritize Mother based on his failure to communicate with her following his house fire. Father cites his testimony that Mother called him less than 24 hours after the fire, that the fire was not traumatic for Child, and that he followed up with texts. He argues that the court awarded primary custody to Mother to "punish Father for what the [court] believed was the negative way Father views the Mother," and that this had "nothing to do with the best interest of the Child." Father's Br. at 36.

The trial court considered the following in determining custody:

> There was a fire at Father's home on December 20, 2017 at 1:30 p.m., while no one was home. At the time, the fire resulted in a six foot by four foot hole on the first floor with smoke damage throughout the home. There was no major loss of Child's toys. However, the damage was severe enough for Father and his family to need to move out of the house and reside elsewhere temporarily while remedial work [wa]s done. When this occurred, Father was understandably dealing with an emergency situation, but he failed to call Mother and advise her about the occurrence of it and to reassure that the Child was unharmed. Mother saw something about this on Facebook and called Father the next day around noon, just under twenty-four hours after the fire, asks Father and he tells her about the fire. Father indicates that he was going to let her know, eventually, but he just had not gotten to it yet. Queries if he or his girlfriend had time to put it on Facebook, how did he not have time to call Mother? The point is, that if Father saw Mother as a priority, he would have called her on the phone. This factor favors Mother.

Court Findings at 6.

The record supports these findings, and the court did not abuse its discretion in considering Father's actions. Both Mother and Father testified that Mother did not learn of the fire until at least the day after it occurred, and that she did not learn of the fire from Father. This is relevant to Father's communication with Mother and that he did not view Mother as a priority in Child's life.

In his next issue, Father claims the court erred in inferring that Father lived in Carlisle to avoid Mother, as the record did not support this inference. Rather, according to Father, he lived in Carlisle because his girlfriend owned a home there. Further, Father disputes the court's finding that he does not see Mother as a priority, as he maintains that the testimony established he tried to include Mother.

The trial court made the following observations:

> Father owns and manages Allentown Tire located in Allentown. He also has another business, which is an on-line business, which means he can do it from anywhere. So, we wonder why he must reside . . . in Carlisle? Does he do that so that he can create a physical distance between the Child and Mother? Does he do that to avoid any possibility of shared custody arrangement? Does he do[] that because his girlfriend is from that area and wants to live in that area? What is the reason that he lives in Carlisle? Indeed[,] he lived in Allentown for a period of time back when he lived with his Mother. These are questions which were never answered. It appears to the Court that Father could just as well live in Allentown.
>
> It appears from the totality of the evidence that Father does not see Mother as a priority as to the Child based upon the past behavior regarding the crime for which . . . she has

been convicted. And he seems to feel that he is in charge, over Mother, in regard to the Child. This is reflective in the way he talks about her, the way he says that the Child needs to get back for something instead of being with Mother, as if . . . whatever he has to get back for something that is more important that the Child's relationship with his Mother. Father seems to have concluded that Mother is a second-class parent by virtue of her DUI and is going to ride that for all its worth and that Mother can never redeem herself.

Court Findings at 6-7.

The trial court noted that Father owned a tire shop in Allentown and his other business was online and noted Father failed to explain why he lived in Carlisle, rather than Allentown. The record supports this. In his brief, Father stated he lives in Carlisle because his girlfriend, who also works at Allentown Fire, owns a home there. However, when asked at the hearing why he lives two hours from Allentown, he just stated he did not need to be there for the shop to run. The trial court did not abuse its discretion.

In his final issue, Father claims the trial court failed to consider the impact the new custody arrangement would have on Child, and claims that awarding primary custody to Mother during the school year was not in Child's best interest. By considering the statutory factors, as outlined above, the trial court considered Child's best interest and determined which custody arrangement would be in Child's best interest. It did not abuse its discretion in concluding it would be in Child's best interest to award Mother primary custody during the school year.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>1/14/19</u>